| | |
|---|---|
| **UNITED STATES DISTRICT COURT** | |
| **DISTRICT OF NEVADA** | |

| | |
|---|---|
| ALLEY CAT, INC.; TOUGH HOUSE MEDIA, INC.; and NICHOLAS PINKOWSKI<br><br>Plaintiff<br><br>v.<br><br>STUART DUNCAN,<br><br>Defendant | 2:16-cv-02745-JAD-CWH<br><br>**Order Granting in Part and Denying in Part Defendant's Motion to Dismiss and Denying Defendant's Motion to Strike Allegations**<br><br>[ECF Nos. 11, 12] |

Plaintiff Nicholas Pinkowski owns corporate plaintiffs Alley Cat and Tough House.[1] Pinkowski and his corporations create and distribute adult-entertainment content.[2] Defendant Stuart Duncan is a Canadian citizen who acquires and licenses adult content for distribution through satellite and other broadcast networks.[3] Pinkoswki sues Duncan for claims arising from a contract they executed in August 2015.[4] Duncan moves to dismiss the complaint for lack of personal jurisdiction, or in the alternative to dismiss Pinkowski's fraud and intentional-interference-with-prospective-economic-advantage claims.[5] Duncan also moves to strike allegations in the complaint related to nonparties.[6] Because Pinkowski makes a prima facie showing of personal jurisdiction, I deny Duncan's motion to dismiss for lack of personal jurisdiction. I also deny Duncan's motion to dismiss the intentional-interference claim because it

---

[1] I refer to all plaintiffs collectively as Pinkowski.

[2] ECF No. 1 at 1.

[3] *Id.*

[4] *Id.*

[5] ECF No. 12.

[6] ECF No. 11.

was not properly brought at the motion-to-dismiss stage, and I deny Duncan's motion to strike as unwarranted. But I grant Duncan's motion to dismiss Pinkowski's fraud claims under Federal Rule of Civil Procedure 9(b), and I give Pinkowski leave to amend those claims.

## Background[7]

Pinkowski is a resident of Nevada, Alley Cat is a Wyoming corporation, and Tough House is a Nevada corporation.[8] Both companies have their principal place of business in Clark County, Nevada.[9] Duncan is a Canadian citizen who also owns a home in California.[10] In the Spring of 2015, Duncan and Pinkowski began negotiations for Duncan to acquire the companies' content and all other assets from both companies.[11] The majority of negotiations "occurred over phone calls Mr. Duncan knowingly made and initiated into the State of Nevada, text messages that Mr. Duncan sent to [Pinkowski] while he knew [Pinkowski] was in Nevada, and during his admitted trips to Nevada."[12]

Duncan visited Las Vegas in April 2015 for three days to negotiate terms of the Asset Purchase Agreement (APA) and "conduct due diligence" on Pinkowski's companies.[13] He visited again in June 2015 to conduct further due diligence.[14] In August 2015, he visited once

---

[7] These facts are taken from Pinkowski's complaint, as well as declarations from both parties for the personal jurisdiction determination only. They are not intended as findings of fact.

[8] ECF No. 1 at 3.

[9] *Id.*

[10] *Id.*; ECF No. 12-1 at 2 (Declaration of Stuart Duncan).

[11] ECF No. 1 at 8.

[12] ECF No. 13-2 at 2 (Declaration of Nicholas Pinkowski).

[13] *Id.*

[14] *Id.* at 3.

more to sign and execute the agreement[15] and to help personally deposit a $45,000 check into Pinkowski's Nevada bank account.[16]

The terms of the APA stipulated that Duncan would purchase the assets associated with Alley Cat and Tough House for $455,000.00. Duncan agreed to remit 25% of revenues he earned by licensing the content he acquired under the APA to third parties until he paid a total of $200,000,[17] and he would pay the balance in 13 monthly installments of $15,000.[18] Duncan's attorneys, who communicated directly with Pinkowski and his attorneys, were based in Colorado when they prepared and finalized the APA.[19] The APA contains a choice-of-law provision selecting Colorado law but does not contain a forum-selection clause.[20]

In August 2015, Duncan subleased office space in Las Vegas to house the Storage Area Network (SAN) that stored the acquired content.[21] One of Duncan's companies hired Forrest Avery as an independent contractor to work in the Las Vegas office and manage and edit the content for distribution.[22] In November, Duncan informed Pinkowski that the Las Vegas office

---

[15] Where the APA was signed and executed is contested. Duncan states that he traveled to Nevada in August only to assist in depositing the check and that he executed the APA in Ottawa. ECF No. 12-1 at 2. Pinkowski cites to text messages between himself and Duncan in which Duncan confirmed he was in Las Vegas on August 19, 2015, and would travel to Pinkowski's office to "get the final steps completed and the agreement signed." ECF No. 13-4 at 2. Pinkowski contends that the agreement was in fact signed in Nevada. ECF No. 13-2 at 4. When determining personal jurisdiction, I resolve any conflicts in the parties' declarations in favor of the plaintiff. *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

[16] ECF No. 13-2 at 4.

[17] ECF No. 1 at 12–13.

[18] *Id.*

[19] ECF No. 12-1 at 2.

[20] *Id.* at 4.

[21] ECF No. 13-2 at 5.

[22] *Id.*; ECF No. 15 (Supplemental Declaration of Stuart Duncan).

3

"[would] be shut down at the end of the current lease" and that Avery would continue to edit movies in Vegas.[23] Pinkowski and Duncan then planned to move the SAN and all other purchased assets to Ottawa.[24] Duncan claims that he has not marketed, licensed, or sold any of the acquired content in Nevada but focuses instead on licensing content in Canada, California, and other U.S. markets.[25]

Duncan traveled to Las Vegas two more times after the APA was executed and met with Pinkowski. In January 2016, Duncan and Pinkowski met and "had planned to discuss business" but it is unclear whether business was actually discussed. For three days in April 2016, Duncan stayed with Pinkowski in Las Vegas and they discussed the APA and their business relationship.[26] In January 2017, Duncan was personally served in Clark County, Las Vegas while attending an Adult Entertainment Expo.[27]

Pinkowski alleges that throughout negotiations for the APA, Duncan made numerous false representations of fact regarding his marketing prowess, his connections with broadcast and satellite networks, and his relationships with others in the industry, all to induce Pinkowski to sell his assets to Duncan. Pinkowski also claims that Duncan fraudulently entered into the agreement with no intention to adhere to the payment terms.

---

[23] ECF No. 13-2 at 5.

[24] The reason for opening a Las Vegas office is also disputed. Duncan claims that the only reason he leased space in Las Vegas was that Pinkowski refused to disassemble and move the SAN to Ottawa in August. ECF No. 12-1 at 3. Pinkowski contends that he never refused to disassemble the SAN and that the decision to move the data to Ottawa was communicated to him later. ECF No. 13-2 at 6.

[25] ECF No. 12-1 at 4–5.

[26] The nature of these visits is disputed. Duncan claims that they were merely social trips; Pinkowski claims that he intended to discuss business during both visits, and that he prepared agendas to discuss the APA's progress in advance of both trips. Pinkowski claims that the APA was discussed during the April visit, but that Duncan did not appear "particularly interested" in discussing business.

[27] ECF No. 13 at 6; ECF No. 4.

Pinkowski further alleges that Duncan breached the contract by failing to make at least two installment payments and the majority of the revenue-based payments required by the APA. He also alleges that Duncan breached the implied covenant of good faith and fair dealing by failing to market the acquired content in the manner he claimed he would, affecting the ability to make revenue-based payments as contemplated. Pinkowski claims that before agreeing to the APA, he and Duncan agreed to a prospective licensing deal with Datatech, a parent company of Internet-streaming and broadcasting services. Duncan agreed that, once the APA with Pinkowski was executed, he would license the acquired content to Datatech for $800,000. Doing so would immediately satisfy the APA's requirement that Duncan pay $200,000 from revenue-based payments. Duncan repeatedly promised Pinkowski that he would license to Datatech but did not do so. After failing to license the content immediately after the APA was signed, Duncan approached Datatech again to discuss a potential licensing agreement. In a meeting with Datatech, Duncan "was insulting and condescending to Datatech's employees, and, upon information and belief, intentionally sabotaged any remaining potential for Datatech to license the Acquired Content from Duncan."[28] Pinkowski also brings an intentional-interference-with-prospective-economic-advantage claim against Duncan based on these allegations.

Lastly, Pinkowski asserts a conversion claim unrelated to the APA. He claims that, while the SAN was part of the tangible property acquired under the APA, Duncan also retained control over a beta-mastering deck (Deck) that was used to process the content found on the SAN. The Deck was not one of the assets transferred under the APA, but Duncan convinced Pinkowski's representative, without Pinkowski's knowledge, to send the Deck to Duncan in Ottawa. Pinkowski has repeatedly requested the Deck's prompt return, but Duncan has refused and is still in possession of the Deck.

**Discussion**

**A.    Personal Jurisdiction**

The due-process clause of the Fourteenth Amendment limits a court's power to bind a

---

[28] ECF No. 1 at 11.

nonresident defendant to a judgment in the state in which it sits.[29] One traditional basis for personal jurisdiction is physical presence in the state. In *Burnham v. Superior Court of California*, the Supreme Court, in a plurality opinion, reaffirmed the principle that "jurisdiction based on physical presence alone constitutes due process" and that it is "fair" for a forum to exercise jurisdiction over anyone who is properly served within the state.[30] The Nevada Supreme Court has held that "[i]t is well-settled that personal jurisdiction may be asserted over an individual who is served with process while present within the forum state."[31] The Nevada Supreme Court has also noted that the United States Supreme Court's holding in *International Shoe* requiring that "the nonresident generally must have 'certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice'" only applies when the defendant is not physically served in the forum state.[32]

       Duncan was personally served in Nevada. Under Nevada law, that alone is sufficient to

---

[29] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Because Nevada's long-arm statute, Nev. Rev. Stat. § 14.065, reaches the limits of due process established by the United States Constitution, *Viega GmbH v. Eighth Jud. Dist. Ct.*, 328 P.3d 1152, 1156 (Nev. 2014), I apply the federal jurisdictional analysis. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) ("When no federal statute governs personal jurisdiction, the district court applies the law of the forum state.").

[30] 495 U.S. 604 (1990); *see also Cripps v. Life Ins. Co. of North America*, 980 F.2d 1261, 1267 (9th Cir. 1992) ("Personal jurisdiction over a defendant can be acquired in one of two ways: by personal service of that defendant or by means of a defendant's 'minimum contacts' with the jurisdiction."); *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1067 (9th Cir. 2014) (referring to this as "tag jurisdiction" that applies to natural persons but not corporations).

[31] *Cariaga v. Eighth Judicial Dist. Court of State*, 762 P.2d 886, 887 (Nev. 1988) (citing *Pennoyer v. Neff*, 95 U.S. 714, 718 (1877) (finding that the court had jurisdiction over defendant personally served in Nevada in a case seeking recovery for a slip-and-fall accident that occurred in California.)

[32] *Id*. at 888 ("[The United States Supreme Court] has never held that a showing of 'minimum contacts' is necessary to justify the exercise of personal jurisdiction when the defendant is personally served with process while present within the forum state."). The plurality in *Burnham* confirms *Cariaga*'s approach. *See Burnham*, 495 U.S. at 619 ("The short of the matter is that jurisdiction based on physical presence *alone* constitutes due process because it is one of the continuing traditions of our legal system . . . .") (emphasis added).

establish personal jurisdiction. The Supreme Court's determination in *Burnham*, however, was a plurality decision; it is unclear whether the "minimum contacts" analysis is still required to satisfy due process when a defendant is physically present in the forum at the time of service.[33] In light of this uncertainty, I also analyze Duncan's minimum contacts.

As the United States Supreme Court explained in the pathmaking *International Shoe* opinion, "[a]lthough a non-resident's physical presence within the territorial jurisdiction of the court is not required" for the exercise of personal jurisdiction, "the nonresident generally must have 'certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[34] "There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant—general jurisdiction and specific jurisdiction."[35] Because Pinkowski abandons any argument that Duncan is subject to general jurisdiction in Nevada,[36] I jump straight to the specific-jurisdiction analysis. And because I find that an evidentiary hearing would not change the outcome of this motion, my inquiry focuses on whether Pinkowski has made a prima facie showing that the court has jurisdiction over Duncan.[37] In evaluating this motion to dismiss under Rule 12(b)(2), I accept as true the uncontroverted allegations in the complaint.[38] I may consider evidence presented in declarations and affidavits

---

[33] Justice Brennan, in a concurring opinion joined by three other justices, agreed that the traditional "transient jurisdiction" rule is generally valid, but concluded that such jurisdiction still must "comport with contemporary notions of due process" discussed in *International Shoe*. *Burnham*, 495 U.S. at 630 (Brennan, J., concurring).

[34] *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations and elipses omitted).

[35] *Boschetto,* 539 F.3d at 1016.

[36] While the complaint alleges both general and specific jurisdiction, Pinkowski only asserts specific jurisdiction arguments in his response to Duncan's motion to dismiss.

[37] *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). I find this motion suitable for disposition without oral argument. LR 78-1.

[38] *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

7

when determining personal jurisdiction.[39] Conflicts between parties over statements contained in affidavits are resolved in Pinkowski's favor.[40]

### 1. Testing for specific jurisdiction

Specific jurisdiction depends on an "activity or an occurrence that takes place in [or is purposely directed at] the forum State and is therefore subject to the State's regulation."[41] "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'"[42] In the Ninth Circuit, we apply the three-prong test from *Schwarzenegger v. Fred Martin Motor Company* for analyzing a claim of specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.[43]

"The plaintiff bears the burden of satisfying the first two prongs of the test. If [he] fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state."[44]

The Ninth Circuit "often uses the phrase 'purposeful availment,' in shorthand fashion, to

---

[39] *Hupe v. Mani*, 2016 WL 3690093, at *4 (D. Nev. July 12, 2016) (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.* 27 F. Supp. 3d 1002, 1008 (N.D. Cal. 2014)); *see also Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).

[40] *Id.*; *see Bancroft & Masters, Inc. v. August Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal.").

[41] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

[42] *Id.* (internal citations and quotations omitted).

[43] *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

[44] *Id.* (internal citations omitted).

include both purposeful availment and purposeful direction, but availment and direction are, in fact, two distinct concepts."[45] The purposeful-availment analysis is used for claims sounding in contract, while the purposeful-direction analysis is used for claims sounding in tort.[46] Because Pinskowki raises both tort and contract claims, I apply both standards.[47]

### 2. Duncan purposefully availed himself of the benefits of the forum state.

"A contract alone does not automatically establish minimum contacts in the plaintiff's home forum."[48] Purposeful-availment analysis examines "prior negotiations and contemplated future consequences," as well as "the parties' actual course of dealing."[49] When parties "reach out beyond one state and create continuing relationships and obligations with citizens of another state," they are "subject to regulation and sanctions in the other State for the consequences of their activities."[50]

Pinkowski has made a prima facie showing of personal jurisdiction over Duncan. Duncan traveled to Las Vegas at least three times for matters directly related to the APA. He personally rented office space in Las Vegas for four months to store assets acquired by the APA. He managed an independent contractor[51] who conducted business directly related to the APA in Las Vegas for approximately six months. Duncan's contention that he only rented office space and hired Avery because Pinkowski refused to dissemble and ship the SAN to Duncan in Ottawa

---

[45] *Id.* (internal citations omitted).

[46] *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015).

[47] *See id.*

[48] *Boschetto*, 539 F.3d at 1017.

[49] *Burger King Corp. v. Rudzewicz*, 471 U.S. 461, 478 (1985).

[50] *Id.* at 479.

[51] Pinkowski refers to the Las Vegas worker as an employee. Duncan contends that he was an independent contractor. For personal-jurisdiction purposes, this is a distinction without a difference. Either way, Duncan affirmatively hired someone in Las Vegas and managed his activities that were indisputably related to the APA.

is disputed by Pinkowski's declaration, which I must accept as true at this motion-to-dismiss stage. Regardless, Duncan took advantage of Nevada laws in furtherance of the APA by renting space and submitting paychecks to the state. That is sufficient to confer personal jurisdiction.[52]

Duncan's two allegedly personal trips to Las Vegas after the APA's execution do not undercut this conclusion. First, the nature of those trips is disputed. Even assuming that two of Duncan's five trips to Las Vegas were not made for the purpose of the APA, this does not outweigh Duncan's other connections with the forum. Neither does Duncan's contention that he did not market or license under the APA in Nevada. His connections with the forum through renting office space, hiring an independent contractor, and repeatedly visiting the state, in addition to the fact that he was personally served in Nevada, demonstrate purposeful availment of the benefits and protections of Nevada's laws.

### 3. Duncan purposely directed his alleged tortious conduct into Nevada.

To purposefully direct activities at a forum state, a defendant must (1) commit an intentional act, (2) expressly aimed at the forum, (3) that causes foreseeable harm in the forum.[53] It is not enough that the defendant's acts might create "foreseeable effects in the forum state."[54] The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[55]

Courts generally recognize that misrepresentations underlying fraud and other tort claims constitute intentional acts for the purposeful-direction analysis.[56] Duncan's alleged conduct

---

[52] *See e.g., Jarzab v. KM Enterprises, Inc.*, 2012 WL 1997814, at *7 (N.D. Cal. June 3, 2012) (paying a resident's salary and renting office space in forum state for four months conferred personal jurisdiction).

[53] *Mavrix Photo Co. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011).

[54] *Wash. Show Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012).

[55] *Walden*, 134 S.Ct. at 1125.

[56] *See e.g., Calder v. Jones,* 465 U.S. 783, 789 (1984) (publishing of allegedly defamatory article constitutes an intentional act); *Schwarzenegger*, 374 F.3d at 806 (holding that communications within an advertisement were an intentional act); *Marlyn Nutraceuticals, Inc. v. Improvita*

underlying Pinkowski's tort claim against him—making false statements, withholding payments, and obtaining property under false pretenses—are intentional.

The "express aiming" requirement "is satisfied when 'the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'"[57] Duncan knew that Pinkowski was a Nevada resident and operated Tough House and Alley Cat within the state, as demonstrated by the numerous visits and communications that Duncan made to Pinkowski in Nevada and his decision to rent office space in Nevada, where the acquired content was held for at least four months after the APA was executed. Duncan's alleged misrepresentations, made while in Nevada and in communications with Pinkowski to Nevada, therefore had foreseeable injurious effects in Nevada.

**4.     Pinkowski's claims arise out of Duncan's forum-related activity.**

A claim arises out of a defendant's forum-related activities if the plaintiff would not have been injured "but for" the defendant's contact with the forum. "The 'but for' test preserves the requirement that there be some nexus between the cause of action and the defendant's activities in the forum."[58] All of Duncan's claims relate to the contract negotiations and misrepresentations that were directed toward Pinkowski in Nevada. Duncan's telephonic correspondence with Pinkowski, as well as Duncan's trips to Nevada, were all part of those misrepresentations. But for Duncan's alleged misrepresentations and breach of the APA and its implied duties, Pinkowski would not have suffered harm in Nevada. Duncan's use of Nevada office space and an employee within Nevada for purposes of the APA further signifies that there

---

*Health Prods.*, 663 F. Supp. 2d 841, 850 (D. Ariz. 2009) (having "no trouble finding that" misrepresentations in fraud claim satisfied the intentional-act requirement of purposeful-direction test); *Summit Growth Mgmt., LLC v. Marek*, 2012 WL 3886089, at *3 (D. Nev. Sept. 6, 2012) (same).

[57] *Dole Food Co., Inc., v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (internal citation omitted).

[58] *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *overruled on other grounds by* 499 U.S. 585; *see also Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1052 n.7 (9th Cir. 1997) ("Although *Shute* has been questioned, the 'but for test' remains viable.").

was a nexus between his performance under the APA and his ties to Nevada.

### 5. Exercise of personal jurisdiction over Duncan is reasonable.

Finally, I evaluate whether the exercise of jurisdiction is reasonable and otherwise comports "with 'fair play and substantial justice.'"[59] I consider: "(1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum."[60] No factor is dispositive.[61]

As discussed in Section A(4), the extent of Duncan's interjection into Nevada affairs weighs in favor of exercising personal jurisdiction. Both Duncan and his associates—who presumably would be witnesses in this case—traveled to Nevada on at least three occasions in connection with the APA, and Duncan has traveled to the state numerous other times to visit Pinkowski and conduct other business. Based on the contact that Duncan had with Nevada in negotiating and obtaining the benefit of the APA, it is reasonable to require him to defend his actions in Nevada.

Pinkowski's interest in convenient and effective relief also weighs in favor of exercising jurisdiction. Pinkowski and his two companies reside in and conduct their activities here. While the assets acquired under the APA have since been transferred to Ottawa, other documents, information, and individuals that are relevant to discovery in this action are found here. Nevada also has an interest in adjudicating a dispute brought by one of its residents. Duncan claims that alternative forums exist in California and Canada. California has no connection to Plaintiff's claims other than the fact that some telephonic negotiations may have occurred while Duncan

---

[59] *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir. 1998), holding modified by *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006).

[60] *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002).

[61] *Id.*

was in California. While there may be an available forum in Canada to adjudicate these claims, it would be unreasonable to make Pinkowski prosecute an action that arose from Duncan's Nevada contacts in a foreign country. Duncan does not argue that there is any conflict with the sovereignty of this court. After considering all of the Ninth Circuit's factors, I conclude that exercise of personal jurisdiction over Duncan in this case is reasonable. So I turn to the remaining dismissal arguments.

### B.     Fraud allegations

Federal Rule of Civil Procedure 8(a) provides the basic standard for federal pleadings: "A pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction . . . .; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought." A complaint is subject to deeper scrutiny when it contains allegations of fraud. Rule 9 of the Federal Rules of Civil Procedure requires a party to "state with particularity the circumstances constituting fraud or mistake." Rule 9's "particularity" standard requires a plaintiff to "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."[62] This increased detail is required "to give defendants notice of the particular misconduct [that] is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."[63] However, "courts must strike a balance between providing adequate notice to the adverse party while at the same time not effectively requiring pre-discovery."[64] Thus, claims grounded in fraud or mistake must meet both Rule 8's "plausibility" standard and Rule 9(b)'s "particularity" standard. "Malice, intent, knowledge, and other conditions of a person's mind

---

[62] *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

[63] *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

[64] *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Gp., Inc.*, 460 F. Supp. 1222, 1238 (D. Nev. 2006) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 999 (9th. Cir. 1999)).

may be alleged generally."[65]

Pinkowski's first, second, and third causes of action[66] are all grounded in fraud, so they are subject to Rule 9(b)'s heightened pleading standard. The complaint states that "during the first half of 2015" and between June and August, 2015, Duncan, through in-person, text, and telephone communications, made misleading statements to Pinkowski that (1) he would aggressively market the acquired content to satisfy the APA's revenue-based payment; (2) overstated his marketing prowess in selling and licensing content to broadcasters; (3) he would enter into a contract with Datatech once the APA was executed, resulting in financial gain for both Duncan and Pinkowski; and (4) he had substantial connections in the broadcasting community. Pinkowski alleged that Duncan knowingly could not aggressively market the content and intentionally overstated his marketing prowess to induce Pinkwoski to agree to the APA and the revenue-based payment structure.

Pinkowski's allegations do not meet Rule 9(b)'s heightened pleading requirements. Pinkowski does not point to any specific statements that Duncan made about his marketing prowess, business connections, or promises to aggressively market acquired content. The vague allegations that he made such statements throughout negotiations that occurred through many mediums are not sufficient to show how or where the statements were made. Pinkowski also does not provide sufficient information about Duncan's representations regarding the Datatech deal. He alternatively alleges that the misrepresentations occurred during the first half of 2015 and between June and August. Basically then, Pinkowski could be referring to any misrepresentations made during the majority of 2015. Such a broad timeframe is insufficient to identify when the alleged fraud occurred.[67]

---

[65] Fed. R. Civ. P. 9(b).

[66] ECF No. 1 at 15–18.

[67] *See e.g., Atl. Richland Co. v. Ramirez*, 176 F.3d 481 (9th Cir. 1999) (unpublished) ("[A]lthough the complaint suggests that the misrepresentations occurred in 'late 1990' or 'early 1991,' merely identifying a period spanning several months does not adequately identify the time of the misrepresentations.").

14

To demonstrate that Duncan's statements were intentional and false, the complaint sets forth facts discussing Duncan's involvement in two other agreements with two non-parties in which Duncan made similar promises and misrepresentations to those alleged in this case. Duncan states without support that Pinkowski "cannot rely on an alleged prior course of misconduct, involving different parties and different facts, to satisfy the Rule 9(b) pleading requirement to support a claim" that Duncan's statements were false and fraudulent. Without any legal support for this contention, Duncan's argument fails at this motion-to-dismiss stage.

The Ninth Circuit frowns on a Rule 9(b) dismissal without leave to amend unless it is clear that the pleading's deficiencies could not possibility be cured by the allegation of additional, specific facts.[68] In the interest of justice, and in light of the circuit's generous leave policy, I grant Pinkowski leave to file an amended complaint if he can allege the detailed facts necessary to support claims one, two, and three. Pinkowski should be mindful that the amended complaint must be complete in itself without reference to the original pleading.[69] Any claims from the original complaint that are not carried forward and asserted in the amended complaint will be deemed abandoned.

### C. Tortious-interference claim

In his eighth claim, Pinkowski alleges that Duncan's interference with the Datatech deal, which Pinkowski would have benefitted from, intentionally interfered with his prospective economic advantage. Duncan argues that, under Nevada law, a plaintiff must prove a prospective contractual relationship between the plaintiff and a third party.[70] Because the prospective contract here was between Duncan and Datatech, Pinkowski cannot state a claim for relief because he was not a potential party. Duncan also argues that "in Nevada, a party cannot,

---

[68] *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1108 (9th Cir. 2003) (citing *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).

[69] L.R. 15-1(a).

[70] *Wichinsky v. Mosa*, 847 P.2d 727, 729–730 (Nev. 1993).

as a matter of law, tortiously interfere with its own contract."[71] Pinkowski responds that he was a third-party beneficiary to the prospective contract, which demonstrates a prospective business relationship sufficient to state a claim.[72]

It is unclear whether the parties agree on which state's law applies to this claim. Although Duncan analyzes the claim under Nevada law, he indicates in a footnote that the choice-of-law provision in the APA may apply to this claim and it should therefore be analyzed under Colorado law.[73] Plaintiff argues that Nevada law applies regardless of the choice of law provision.[74] Pinkowski has alleged that as a result of Duncan's interference with the Datatech deal, Pinkowski was deprived of a recognizable business expectancy. At this stage in the proceedings, I find that sufficient to state a claim. If Duncan believes that this claim fails as a matter of Nevada law, he can make that argument in a motion for summary judgment.

**D.     Duncan's Motion to Strike Allegations**

Federal Rule of Civil Procedure 12(f) gives me authority to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ."[75] Striking a complaint's allegations under Rule 12(f) is generally disfavored, and should be granted rarely, as "when necessary to discourage parties from raising allegations completely unrelated to the

---

[71] *Blanck v. Hager*, 360 F. Supp. 2d 1137, 1154 (D. Nev. 2005) (citing *Bartsas Realty, Inc. v. Nash*, 402 P.2d 650, 651 (1965)) (plaintiff could not bring tortious-interference claim against defendants based on defendants' breach of their own contract with plaintiff).

[72] ECF No. 13 at 22.

[73] ECF No. 12 at 17 n.2.

[74] ECF No. 13 at 22 n.7.

[75] *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

relevant claims and when the interests of justice so require."[76]

Duncan asks me to dismiss the portion of the complaint discussing Duncan's business relationships with Michael Ninn and Larry Flynt Publications, Inc. (LFP),[77] neither of whom is a party to this action. Duncan argues that the allegations related to Ninn and LFP "have nothing to do with the alleged breach of the APA or Plaintiffs' other claims, and the events alleged appear to pre-date Plaintiffs' claims."[78] Pinkowski responds that Duncan's dealings with Ninn and LFP are relevant because they demonstrate a "broad pattern of Duncan's repeated and habitual conduct" indicating that Duncan knew his various misrepresentations in this case were intentional.[79]

Pinkowski's allegations do not rise to the level required to strike them under Rule 12(f). Pinkowski has sufficiently alleged that the nonparty allegations in his complaint are related to his fraud claims. So I deny the motion to strike.

## Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendant Duncan's motion to dismiss **[ECF No. 12] is DENIED in part and GRANTED in part**. Duncan's motion to dismiss for lack of personal jurisdiction and to dismiss Pinkowski's intentional-interference-with-prospective-economic-advantage claim is denied. Duncan's motion to dismiss claims one, two, and three is granted. Pinkowski must file and serve an amended complaint consistent with this order by **October 18, 2017**, if he can plead facts to overcome the deficiencies described in this order. Pinkowski's failure to timely file an amended complaint containing the necessary facts to support his first, second, and third claims for relief will result in their dismissal with prejudice.

---

[76] *Davis v. Astrue*, 2007 WL 2088580, at *3 (N.D. Cal. July 18, 2007) (citing *Augustus v. Bd. of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir. 1962)).

[77] *See* ECF No. 1 at ¶¶ 21-39.

[78] ECF No. 11 at 3.

[79] ECF No. 13 at 20–21.

17

IT IS FURTHER ORDERED that Duncan's motion to strike non-party allegations **[ECF No. 11] is DENIED.**

DATED: September 28, 2017.

_____
U.S. District Judge Jennifer A. Dorsey